IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

ROLANDO STOCKTON,
*Defendant.*

Criminal Action No. ELH-99-352

**MEMORANDUM OPINION**

Rolando Stockton is serving a sentence of 480 months of imprisonment, dating to September 1999, for drug trafficking and related crimes. Through counsel, he has filed an emergency motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) (ECF 663), supported by a memorandum (ECF 665) (collectively, the "Motion") and several exhibits. ECF 665-1 to ECF 665-5. Stockton asks the Court to reduce his sentence to time served, with a period of home confinement as a condition of supervised release. Alternatively, he asks the Court to reduce his sentence to 330 months, which corresponds to the sentence initially imposed by Judge Marvin Garbis, to whom the case was originally assigned; that sentence was reversed by the Fourth Circuit. ECF 665 at 2.[1] The government opposes the Motion. ECF 670. Defendant has replied. ECF 673. Defendant has also submitted supplemental correspondence. ECF 676.

No hearing is necessary to resolve the Motion. For the reasons that follow, I shall grant the Motion and reduce defendant's sentence to time served, with the added condition of home confinement as a condition of supervised release.

---

[1] The case was reassigned to me due to the retirement of Judge Garbis. *See* Docket.

## I.   Background[2]

Defendant and five others were charged with drug and firearms offenses in a Superseding Indictment filed on August 19, 1999.  ECF 33.[3]  A Third Superseding Indictment, filed in April 2000, added a seventh defendant.  ECF 210.  Defendant's brother, Stover Stockton, was one of the codefendants.  In order to distinguish the defendant from his brother, I shall refer to the defendant as "Stockton" or "defendant" and to his brother as "Stover."  Stockton was named in a Fifth Superseding Indictment, filed only as to him on April 17, 2001.  ECF 371.

Some defendants pleaded guilty.  Stover and another defendant, Levi Johnson, faced added charges of conspiring to murder U.S. District Judge Benson Legg and then-United States Attorney Richard D. Bennett.[4]  *See generally United States v. Stover Stockton*, No. ELH-99-352, ECF 657 (recounting the procedural history of Stover's case).  Stockton was not charged with those offenses, however.  Therefore, his case was severed for trial.  *United States v. Rolando Stockton*, ELH-99-352, ECF 570 at 9-10.

Stover and Johnson proceeded to trial in January 2001.  *See* Docket.  After the trial of Stover and Johnson, Stockton proceeded to trial.  Before doing so, he rejected two plea offers to an offense under 18 U.S.C. § 922(g), which would have called for a sentence of no more than ten years.  *United States v. Rolando Stockton*, ELH-99-352, ECF 570 at 9-10.

At defendant's trial, the government presented evidence of a dangerous and violent heroin trafficking conspiracy in the Park Heights neighborhood of Baltimore. *See United States*

---

[2] Because of the age of the case, many of the early pleadings are not available on the electronic docket. The first electronically available entry appears at ECF 465 on April 1, 2004. But, the entries are not fully available electronically until February 5, 2009, with ECF 530.

[3] Defendant's brother, Stover Stockton, and four others were initially charged in an indictment filed on August 12, 1999.  ECF 1. Defendant was not charged at that time.

[4] Richard Bennett is now a U.S. District Judge in Maryland.

*v. Stockton*, 349 F.3d 755, 765 (4th Cir. 2003). The conspiracy extended from 1994 through April 2000. However, Stockton was incarcerated on State charges for much of the conspiracy's duration. *See* ECF 665-3 (Presentence Report or "PSR"), ¶ 8.

The government presented evidence that the conspiracy used violence to effectuate its objectives. ECF 665-3, ¶¶ 11, 13; *see also* ECF 656 (PSR of codefendant, referencing two murders); ECF 531 (defense counsel's memorandum in a § 2255 petition) at 3-4. Specifically, Stockton shot at Ricky Ricardo Jones, although the bullet that was meant for Mr. Jones actually struck Clinton Williams. ECF 665 at 4. And, the total quantity of heroin involved in the offense exceeded one kilogram. At trial, Stockton testified in his own defense. ECF 531 at 4.

On May 30, 2001, the jury convicted Stockton of Counts One, Two, Three, Four, and Five. These counts charged conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. § 846 (Count One); use of a firearm in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Counts Two and Three); and being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (Counts Four and Five). ECF 394.

Sentencing was held on January 15, 2002. *See* Docket. At the time, the defendant was 28 years old. ECF 665-3 at 2.

The PSR reflected a base offense level of 32 for Stockton. *Id.* ¶ 22. However, it was adjusted upward on several grounds. *Id.* ¶¶ 25, 26, 27, 28. With grouping, Stockton had a final offense level of 37 for Counts One, Four, and Five. *Id.* ¶ 41. Counts Two and Three did not group. *Id.*

The defendant had nine criminal history points, which equates to a criminal history category of IV.  *Id.* ¶ 58.  But, defendant was deemed a career offender pursuant to U.S.S.G. § 4B1.1.  *Id.* ¶ 28.  Thus, the PSR reflected a criminal history of VI.  *Id.* ¶ 59.

Counts One, Two, and Three carried mandatory minimum penalties.  *Id.* ¶ 42. For Count One, Stockton faced a mandatory minimum sentence of ten years with a maximum of life imprisonment under 21 U.S.C. §§ 841(b)(1)(A).   ECF 665-3, ¶ 64.   Count Two required a minimum sentence of ten years with a maximum of life imprisonment, consecutive, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii).  *Id.* ¶ 65.  And, Count Three required a consecutive sentence of 25 years to life, pursuant to 18 U.S.C. § 924(c)(1)(C)(i). *Id.* ¶ 66; *see also* § 2K2.4 of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines").

With an offense level of 37, and a criminal history category of VI, Stockton's Guidelines for Counts One, Four, and Five called for a period of imprisonment ranging from 360 months to life. ECF 665-3, ¶ 69. And, as indicated, Counts Two and Three had mandatory minimum sentences. *Id.* ¶ 42. But, prior to sentencing, the court vacated the § 924(c) conviction in Count Three. *See* ECF 415 (Motion of defendant to vacate Count Three); ECF 420 (Marginal Order granting motion to vacate); *but see* ECF 570 at 2 n.1 (Memorandum Opinion of Judge Garbis, stating that government dismissed the § 924(c) count prior to sentencing); *see also* ECF 670 at 2 n.3 (government stating that the court vacated the conviction). Therefore, for Counts One, Two, Four, and Five, the defendant faced Guidelines of 480 months to life (*i.e.*, 360 months for Counts One, Four, and Five and 120 months for Count Two). At the time of sentencing, the Guidelines were mandatory, not advisory. *See United States v. Booker*, 543 U.S. 221 (2005).

Judge Garbis departed downward, over the government's objection, from a Guideline sentence of 480 months' incarceration.  *See* ECF 570 at 2.  It appears that Judge Garbis thought

that Stockton's career offender designation under U.S.S.G. § 4B1.1 overstated his criminal history.     Therefore, he sentenced Stockton to an aggregate sentence of 330 months' imprisonment: 210 months for Counts One, Four, and Five plus 120 months for Count Two.  *See* ECF 421 (Judgment, docketed January 28, 2002). The sentence dated to Stockton's arrest on May 18, 1999.

Stockton noted an appeal to the Fourth Circuit.  ECF 422.  The government filed a cross appeal as to the sentence (ECF 427), challenging the 150-month downward departure.   On November 17, 2003, the Court of Appeals for the Fourth Circuit affirmed Stockton's convictions, but reversed the District Court's decision to depart downward with regard to the career offender sentence.  *See* ECF 464; *see also United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003) (per curiam).  The Court said, *id.* at 765: "Rolando Stockton is exactly the type of person to whom the career offender classification is intended to apply."

Thus, the Fourth Circuit remanded for a new sentencing, instructing Judge Garbis to apply the career offender classification.  Judge Garbis did so at the resentencing held on March 12, 2004.  *See* Docket.  An Amended Judgment was entered on April 1, 2004, reflecting a total term of imprisonment of 480 months' incarceration.  ECF 465.  As defendant puts it, Judge Garbis "was forced to impose a 480-month sentence on remand."  ECF 665 at 1.

There is a long post-conviction history. I shall reference only a portion of it.

On January 5, 2006, Stockton filed a motion to vacate under 28 U.S.C. § 2255.  ECF 494. In a Memorandum and Order of July 13, 2006 (ECF 501), Judge Garbis denied the motion as time barred.  ECF 570 at 4. The court later denied Stockton's Motion to alter or amend.  *See* ECF 503, ECF 504.  But, in a Memorandum and Order of September 15, 2006 (ECF 509), Judge Garbis authorized the filing of an appeal, nunc pro tunc, from the resentencing held on March 12,

2004.  The Fourth Circuit dismissed the appeal on July 20, 2007.  ECF 518; *see United States v.*
*Stockton*, 240 Fed. App'x 601 (4th Cir. 2007).

Then, through court appointed counsel (ECF 524), Stockton filed an amended § 2255
petition, presenting the ground that defendant had been denied effective assistance of counsel.
*See* ECF 530; ECF 531. Counsel argued, *inter alia*, that the trial lawyer "was ineffective for
failing to properly advise [Stockton] of the maximum penalty for his offenses, leading to [his]
rejecting two plea offers made by the government." ECF 531 at 5. Counsel noted that the
government initially offered Stockton a sentence of six years, and his trial counsel mistakenly
told him that he faced no more than ten years of imprisonment. *Id.* at 8. In actuality, he faced "a
potential life sentence." *Id.* Later, according to post-conviction counsel, Stockton was offered a
plea agreement that would have resulted in a twelve-year sentence. *Id.* at 8-9. Again, the plea
offer was rejected. *Id.* at 9.

By Memorandum and Order of June 19, 2004 (ECF 540), Judge Garbis rescinded his
ruling in ECF 501. He found that Stockton's attorney had failed to file a timely § 2255 motion,
despite the court's direction to do so. Therefore, merits hearings were held regarding the § 2255
petition (ECF 530) on August 20, 2009 (ECF 547), May 6, 2011 (ECF 557), and July 19, 2011.
ECF 561.

In a comprehensive, 35-page Memorandum and Order of July 5, 2012, Judge Garbis
denied the § 2255 petition. ECF 570. He acknowledged that Stockton was "offered two
opportunities to plead guilty pursuant to agreements that would have called for a sentence of no
more than ten years." *Id.* at 9-10. As to the first plea offer, Judge Garbis found that the offer "in
writing, provided for a likely sentence in the range of 92-115 months." *Id.* at 10 n.5. With respect
to the second offer, Judge Garbis noted that "the evidence establishes that the…offer would have

been to a charge providing a 10 year maximum sentence." *Id.* at 10 n.6.[5]  Nevertheless, he found that Stockton did not establish that his trial counsel provided ineffective assistance of counsel in regard to the plea agreements or the sentencing.

As to the plea offers, Judge Garbis reasoned that Stockton declined to plead guilty because he "steadfastly professed his innocence of all charges." *Id.* at 31. Thus, Judge Garbis concluded that Stockton "would not have accepted either plea offer had Trial Counsel simply recommended acceptance [of the plea offer]." *Id.* at 32. Rather, "[m]uch more would have been necessary to persuade" Stockton to plead guilty. *Id.*

Stockton subsequently noted an appeal to the Fourth Circuit.  ECF 572.  That Court affirmed in an unpublished, per curiam opinion issued on November 20, 2013.  ECF 596.  The mandate issued on January 13, 2014.  ECF 597.

In orders of March 1, 2017 (ECF 624) and June 21, 2017 (ECF 626), Judge Garbis denied Stockton's motions for reduction of sentence and for modification of sentence. *See* ECF 602; ECF 623.  A Rule 60(b)(5) Motion followed on January 23, 2018.  ECF 627.  There, Stockton sought to vacate the Court's Memorandum and Order of July 5, 2012 (ECF 570), denying his § 2255 motion.  This Court denied the Motion by Memorandum and Order of December 18, 2018.  ECF 631, ECF 632.

Stockton has now served almost 22 years of his sentence. With good conduct credit, he has served over 25 years and 3 months. This equates to almost 65% of his 480-month sentence. If the Court were to consider the 330-month sentence that Judge Garbis initially imposed, Stockton has served about 93% of that sentence.

---

[5]  The discrepancy between Judge Garbis's summary of the two plea offers and the summary by post-conviction counsel is not material here. It is clear that the government made two plea offers, both with potential sentences far below 480 months.

Stockton suffers from both high blood pressure as well as obesity. ECF 665-2 (Medical Records). Both of these conditions place him at greater risk of developing serious complications should he contract COVID-19.

According to Stockton's counsel, defendant's codefendant and brother, Stover, was more culpable than defendant. ECF 665 at 1. Although Judge Garbis originally sentenced Stockton to 330 months, Stover received a sentence of 390 months. Yet, in 2016, Stover's sentence was reduced to 324 months, pursuant to Amendment 782. *See United States v. Stover Stockton*, No. ELH-99-352, ECF 620. And, more recently, the Court reduced Stover's sentence to time served under 18 U.S.C. § 3582. *Id.* at 2; *see United States v. Stover Stockton*, No. ELH-99-352, ECF 657.

On April 8, 2020, Stockton filed a request for a sentence reduction with the Warden of FCI Petersburg Low. *See* ECF 665-1. According to defense counsel, Stockton did not receive a decision from the warden. Therefore, he has exhausted his administrative remedies, as required by 18 U.S.C. § 3582(c)(1)(A).

Additional facts are included, *infra*.

## II.    Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S § 3582(c)(1)(A)(i)

provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was adopted as part of the Sentencing Reform Act of 1984.  It originally permitted a court to alter a sentence only upon a motion by the Director of the BOP.  *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).  Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.  *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

However, for many years the safety valve of § 3582 languished.  The BOP rarely filed motions on an inmate's behalf.  As a result, compassionate release was exceedingly rare.  *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress significantly amended the compassionate release mechanism when it enacted the First Step Act of 2018 ("FSA").  *See* Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020).  As amended by the FSA, 18 U.S.C. § 3582(c)(1)(A) permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.   So, once a defendant has exhausted his administrative remedies, he may petition a court directly for compassionate release.  *McCoy*, 981 F.3d at 276.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, in U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might warrant compassionate release.  *See McCoy*, 981 F.3d at 276. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C).  *McCoy*, 981 F.3d at 276. However, as the *McCoy* Court observed, the policy statement was issued in 2006 and was last updated in November 2018, prior to the enactment of the First Step Act in December 2018.  *Id.*

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§

10

1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."    U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1 to U.S.S.G. § 1B1.13 defines "Extraordinary and Compelling Reasons" in part as follows:

> 1.  **Extraordinary and Compelling Reasons**.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
> (A)  **Medical Condition of the Defendant**.—
>
> > (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
> >
> > (ii) The defendant is—
> >
> > > (I)  suffering from a serious physical or medical condition,
> > >
> > > (II) suffering from a serious functional or cognitive impairment, or
> > >
> > > (III) experiencing deteriorating physical or mental health because of the aging process,
> >
> > that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

Application Note 1(B) provides that age is an extraordinary and compelling reason where the defendant is at least 65 years of age, has serious physical or mental health issues, and has

served at least 10 years in prison or 75% of the sentence.  Application Note 1(C) concerns Family Circumstances.  Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

The BOP regulation appears at Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 2582 and 4205.  However, the Court may not rely on the Program Statement.  Rather, the Court must consider the Sentencing Commission's policy statements.  *United States v. Taylor*, 820 F. App'x 229, 229-30 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

As noted, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").  However, as indicated, the policy statement in § 1B1.13 of the Guidelines was last updated in November 2018, before the enactment of the First Step Act.  Thus, it is only "directed at BOP requests for sentence reductions."  *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13).  In other words, "[b]y its plain terms…§ 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at *7; *see also United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1108-

12 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180-81 (7th Cir. 2020).

Accordingly, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283.  Therefore, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (quoting *Zullo*, 976 F.3d at 230).

Nevertheless, as the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  If the defendant can show an extraordinary and compelling reason that renders him eligible for a sentence reduction, the Court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate.  *Dillon*, 560 U.S. at 826-27; *see also United States v. Trotman*, 829 Fed. App'x 607, 608-9 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under 18 U.S.C. § 3582(c)(1)(A), the court must consider the sentencing factors under 18 U.S.C. § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020).   But, compassionate release is a "rare" remedy.  *Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020); *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019).

### III.    COVID-19[6]

Defendant filed his Motion while the nation is "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020). That crisis is COVID-19.[7]  The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, PX-20-1028, 2020 WL 2571168, at *1 (D. Md. May 21, 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic. *Id.*

That said, the COVID-19 pandemic is the worst public health crisis that the world has experienced since 1918. *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Although many people who are stricken with the virus experience only mild or moderate symptoms, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted). And, the pandemic "has produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *stayed*, 818 Fed. App'x 393 (6th Cir. 2020)  Indeed, for a significant period of time, life as we have known it

---

[6] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[7] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

came to a halt.  Although many businesses and schools reopened for a period of time, many are again subject to closure or substantial restrictions, due to the virulent resurgence of the virus in recent weeks.

The Court must also underscore that the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), [https://bit.ly/2XoiDDh](https://bit.ly/2XoiDDh).   As of March 3, 2021, COVID-19 has infected more than 28.7 million Americans and caused over 517,00 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., [https://bit.ly/2WD4XU9](https://bit.ly/2WD4XU9) (last accessed Mar. 3, 2021).

Unfortunately, there is currently no cure or proven treatment that is generally available for the virus.  But, the country has recently seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson). The vaccines were initially made available to health care workers and the elderly in nursing homes.  But, the criteria for eligibility has expanded considerably and varies among the States.

Notably, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Therefore, once the BOP receives the vaccine, a prisoner at heightened risk will receive priority for receipt of the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-

of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As  of  March

11, 2021, the BOP had 124,779 federal inmates and 36,000 staff. And, by that date, the BOP had

administered 75,395 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/

(last accessed Mar. 11, 2021).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has

identified certain risk factors that increase the chance of severe illness.  Those risk factors

initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart

disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus

Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE

CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

On June 25, 2020, and again on July 17, 2020, the CDC revised its guidance as to

medical conditions that pose a greater risk of severe illness due to COVID-19. Then, on

November 2, 2020, to reflect the most recently available data, the CDC again revised its

guidance. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE

CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY.   According to the CDC, the

factors that increase the risk include cancer; chronic kidney disease; COPD; being

immunocompromised; obesity, where the body mass index ("BMI") is 30 or higher; serious heart

conditions, including heart failure and coronary artery disease; sickle cell disease; smoking;

pregnancy; and Type 2 diabetes. *Id.*  The CDC has also indicated that the risk for severe illness

from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At

Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR

DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1.

In addition, the CDC created a second category for conditions that "might" present a risk for complications from COVID-19. The factors that might increase the risk include asthma, cerebrovascular disease, hypertension, liver disease, cystic fibrosis, neurologic conditions, a compromised immune system, overweight (where the BMI is between 25 and 30), pulmonary fibrosis, thalassemia (a type of blood disorder), and Type 1 diabetes. *See id.*

Thus far, the only way to slow the spread of the virus is to practice "social distancing." *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). Social distancing is particularly difficult in the penal setting, however. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe,'* WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for PPE and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional

facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

The Department of Justice ("DOJ") has recognized the unique risks posed to inmates and employees of the Bureau of Prisons ("BOP") from COVID-19.  The DOJ has adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, the

Attorney General issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at \*9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at \*2.  Notably, the BOP has implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."

As with the country as a whole, the virus persists in penal institutions.[8]  As of March 11, 2021,  BOP reported that 678 inmates out of a total of 124,779 inmates, and 1,527 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 47,064 inmates and 5,020 staff have recovered from the virus; and 225 inmates and four staff members have died from the virus.  Moreover, the BOP has completed 106,556 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/ (last accessed Mar. 11, 2021).  *See COVID-19*, Fed. Bureau of Prisons, https://bit.ly/2XeiYH1.

---

[8] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2. More recently, on October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.  *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020),  https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

With respect to USP Yazoo City, where the defendant is now a prisoner, as of March 11, 2021, the BOP reported that two inmates and seven staff have tested positive for COVID-19 and 236 inmates and 12 staff have recovered at the facility. And, at the Yazoo City complex, 262 staff and 113 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/ (last accessed Mar. 11, 2021).

## IV.    Discussion

Stockton seeks a reduction of his sentence to time-served under 18 U.S.C. § 3582(c)(1)(A)(i), contending that his medical conditions place him at heightened risk of severe illness from COVID-19, and constitute an "extraordinary and compelling" basis for his release. ECF 665 at 6.  In particular, Stockton avers that he has high blood pressure and asserts that his weight "has fluctuated around the threshold for obesity." *Id.* at 7; *see* ECF 665-2 (Medical Records).  Moreover, Stockton posits that he is not a danger to the community and the factors under 18 U.S.C. § 3553(a) favor his release. *Id.* at 19-29.

The government opposes Stockton's release on each ground.  It contends that Stockton has not established extraordinary and compelling reasons for immediate release. ECF 670 at 11-15. In any event, the government maintains that the § 3553(a) factors militate against a reduction of Stockton's sentence.  *Id.* at 21-25.

### A.    EXTRAORDINARY AND COMPELLING ANALYSIS

To be sure, the coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.). But, Stockton, who is now 49 years of age, is overweight, with a BMI of 29, and suffers from hypertension. ECF 665-2 at 2. Stockton takes medication for hypertension and his blood pressure readings from 2019 and 2020 span from "elevated" through "Hypertension Stage 2." ECF 665 at

8-9; ECF 665-2 at 5.  According to the CDC, either of these conditions might increase the risk for severe illness from COVID-19. *See People of Any Age with Underlying Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 2, 2020), https://bit.ly/38S4NfY; *see also* Emily Anthes, *Severe Obesity Raises Risk of Covid-19 Hospitalization and Death, Study Finds*, N.Y. TIMES (Mar. 8, 2021) ("A large new study has confirmed an association between obesity and patient outcomes among people who contract the coronavirus.").  Further, the CDC cautions that the "more underlying medical conditions someone has, the greater their risk is for severe illness from COVID-19." *Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

Numerous courts have found that, in light of the COVID-19 pandemic, a serious chronic medical condition, such as hypertension, qualifies as a compelling reason for compassionate release. *See, e.g., United States v. Salvagno*, No. 5:02-cr-00051-LEK, 2020 WL 3410601 (N.D.N.Y June 22, 2020) (granting compassionate release to inmate whose sole medical condition was hypertension); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension constituted extraordinary and compelling reason); *United States v. Patterson*, TJS-20-1078, 2020 WL 2217262, at *3 (D. Md. May 7, 2020) ("There is ample evidence that people with hypertension are more likely to experience complications if they become infected with COVID-19"); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (defendant's diabetes, hypertension, obesity, and age constituted extraordinary and compelling reason); *United States v. Pena*, No. 15-CR-551 (AJN), 2020 WL 2301199, at *4 (S.D.N.Y. May 8, 2020) ("This Court has repeatedly recognized that COVID-19 presents a heightened risk for individuals

21

with hypertension[.]"); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection).

Accordingly, I am satisfied that Stockton satisfies the "extraordinary and compelling" prong of the § 3582 analysis.

## B.  Sections 3142(g) and 3553(a)

Relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if the defendant "is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). To determine whether a defendant is a danger to the community, the Court must consider the factors under 18 U.S.C. § 3142(g), including the nature and circumstances of the offense, the history and characteristics of the defendant, and the danger that release would pose to any person or the community.

The Court must also consider the factors set forth in 18 U.S.C. § 3553(a), as required by 18 U.S.C. § 3582(c)(1)(A).  These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent  Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.

The government maintains that Stockton is "a very dangerous man, with a history of non-compliant and anti-social behavior." ECF 670 at 22. And, it contends that his current sentence reflects the seriousness of his offenses; he "was convicted of shooting Clinton Williams, he committed perjury at trial, and re-immersed himself in the drug business immediately upon his release from prison." *Id.* at 23.

22

Defendant acknowledges the seriousness of his offense. But, he contends that he "is not the young man he was in the 1990s" and "has worked hard to make up for the deficits of his childhood and learn skills to help him succeed once he returns to the community." ECF 665 at 19. Further, he avers that a reduced sentenced is warranted because "the charging and sentencing landscape today is dramatically different than the one" he faced in 1999 and 2004. *Id.* at 23.

The gravity of Stockton's crimes cannot be minimized. He was convicted of participating in a violent drug trafficking organization and the drug quantity was substantial.  And, at trial, he testified and denied his involvement in a shooting attributed to him, despite strong evidence to the contrary. *See* ECF 531 at 6.

However, the conspiracy spanned the period from 1994 to 2000, and Stockton "was absent" between 1994 and 1999, because he was incarcerated by the State of Maryland. ECF 531 at 3. Specifically, in June 1995, the defendant was found in violation of State probation and was sentenced to six years' incarceration. ECF 665-3, ¶¶ 47, 49. He was released on April 29, 1999. *Id.; see also id.* ¶ 53.[9] Therefore, defendant was imprisoned for much of the conspiracy's duration.

Significantly, on the very same facts that led to the 480-month sentence for Stockton, the government had twice offered Stockton a plea agreement, calling for a sentence of about ten years. ECF 570 at 9-10; ECF 665 at 3-4.  For whatever reason, Stockton rejected the plea offers and proceeded to trial. But, the plea offers certainly suggest that the government regarded as sufficient a sentence far shorter than the one that was imposed.

To be sure, with the original plea agreements, the government undoubtedly considered that, by pleading guilty, Stockton would spare the government, the Court, jurors, and witnesses

_____

[9] It appears that Stockton was on home detention a few months prior to April 1999. *See* ECF 665 at 18 n.11; ECF 670 at 3.

the challenges and burdens of the trial process. Understandably, the government rewards defendants who accept responsibility for their criminal conduct, and who are willing to avoid the burdens of a trial. Defendant rejected the offers and put the government, the Court, jurors, and witnesses through a trial. On these facts, it was entirely reasonable for the government to decide that the initial plea offers were no longer warranted. That said, the sentence of 480 months, which essentially quadrupled the original plea offers, would seem to constitute punishment of the defendant for his decision to proceed to trial. And, in its submission, the government does not provide a justification for the enormous discrepancy. Indeed, it does not even address the disparity between the original plea offers and Stockton's sentence. *See* ECF 670.

Certainly, Stockton's criminal history cannot be minimized. However, all of Stockton's previous convictions occurred between 1990 and 1994, when the defendant was between the ages of 18 and 22. *See McCoy*, 981 F.3d at 286 (noting that courts often consider a defendant's relative youth at the time of their offense as relevant in analyzing compassionate release motions). And, for the most part, his offenses were comparatively minor.

In particular, in 1990, at the age of 18, Stockton was arrested for possession with intent to distribute cocaine. ECF 665-3, ¶ 47. He received a ten-year suspended sentence. *Id.* Based on a violation of probation, he was subsequently sentenced to three years. *Id.* Then, a second violation of probation led to a six-year sentence. *Id.*

In 1991, still at the age of 18, the defendant was arrested for distribution of cocaine. *Id.* ¶ 49. He received a ten-year suspended sentence. But, he twice violated his probation and received sentences concurrent with those referenced above. *Id.*

Defendant was convicted in 1993 of making a false statement to an officer and driving on a revoked license, for which he was sentenced to time served. *Id.* ¶ 51. And, defendant was also

convicted in 1996 of a handgun offense. *Id.* ¶ 53. He received three years of incarceration, which he served concurrent with the sentences outlined above for violation of probation. *Id.*

Defendant's prior record scored nine criminal history points. *Id.* ¶¶ 47, 49, 56, 57. The two drug offenses from 1990 and 1991 were the only two offenses that scored points. They also constituted the basis for defendant's career offender designation. *See id.* ¶ 59. Two points were added because defendant was on supervised release at the time of the underlying offense. *Id.* ¶ 56; U.S.S.G. § 4A1.1(d). And, one point was added because Stockton committed the underlying offense less than two years after his release from custody in 1999, in the cases referenced in paragraphs 47, 49, and 53 of the PSR. *See* ECF 665-3, ¶ 57; U.S.S.G. § 4A1.1(e).

As mentioned, Judge Garbis initially departed downward from the Guidelines by 150 months, sentencing Stockton to an aggregate term of 330 months' imprisonment. *See* ECF 421 (Judgment, docketed January 28, 2002). But, the Fourth Circuit reversed his decision. *See* ECF 464; *see also United States v. Stockton*, 349 F.3d 755 (4th Cir. 2003) (per curiam). Thus, Judge Garbis "was forced to impose a 480-month sentence on remand." ECF 665 at 1.

After Stockton was sentenced, the Supreme Court decided *United States v. Booker*, 543 U.S. 221 (2005), in which the Guidelines were deemed advisory. And, "the career offender provision is an advisory guideline promulgated by the United States Sentencing Commission.[]" *United States v. Furlow*, 928 F.3d 311, 314 (4th Cir. 2019). Therefore, in the post-*Booker* sentencing landscape, Judge Garbis would not have been constrained by the career offender Guidelines and would have been able to impose the 330-month sentence.

Defendant argues: "As a result of the collective changes in applicable law, Mr. Stockton's 40-year sentence is so out of step with current sentencing practices that it more than doubles the average sentence federal courts impose for murder." ECF 665 at 27. Indeed,

Stockton's sentence of 40 years is significantly longer than at least some federal sentences imposed more recently for drug offenses involving violence. Statistics compiled by the United States Sentencing Commission, for example, show that for fiscal year 2019, the average national sentence imposed for drug trafficking is 76 months (6 years, 4 month); for murder, 255 months (21 years, 4 months); for firearms, 50 months (4 years, 2 months); and for kidnapping, 171 months (14 years, 3 months). *See* Table 15, "Sentence Imposed by Type of Crime," https://www.ussc.gov/2019-Annual-Report-and-Sourcebook ("2019 Sourcebook"); *see also United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)).

For example, in *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted after a 25-day trial. *See id.*, ECF 477; ECF 491. In particular, Floyd was convicted of a racketeering conspiracy that included murders and drug conspiracy. Floyd was not the shooter, however.  Although his offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months' imprisonment. *Id.*, ECF 691.

More recently, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore, and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy. *See id.*, ECF 349 at 9-10. Pursuant to a plea agreement, Antoine entered a plea of guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime. *Id.*  Although Antoine was the shooter, pursuant to Fed. R. Crim. P. 11(c)(1)(C), the government has agreed to a term of imprisonment ranging between 20 and 25

26

years. *Id.* at 6.[10]

As part of the § 3553(a) analysis, many judges in this District have considered a change in the sentencing law landscape that a defendant would face if prosecuted today. *See, e.g., United States v. Chandler*, GLR-05-0181, ECF 119 at 1-2 (D. Md. May 14, 2020); *United States v. Decator*, 452 F. Supp. 3d 320 (D. Md. 2020), *aff'd*, *McCoy*, 981 F.3d 271; *United States v. Laurey*, JKB-06-0586, ECF 81 at 1, 3 (D. Md. Feb. 19, 2020); *United States v. Wesley*, JKB-10-0118, ECF 73 at 1 (D. Md. Feb. 18, 2020); *United States v. Smith*, DKC-98-0252, ECF 92 at 4 (D. Md. Feb. 14, 2020); *United States v. Watts*, PJM-06-036, ECF 114 at 7 (D. Md. Feb. 6, 2020); *United States v. Thompson*, CCB-09-0128, ECF 123 at 2 (D. Md. Jan. 16, 2020). As Judge Bennett recently explained: "[C]hanges in the sentencing law landscape are relevant to the Court's analysis of whether the Court's sentence appropriately addresses 'the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.'" *United States v. Johnson*, No. RDB-07-0153, ECF No. 183 at 10-11 (D. Md. Oct. 14, 2020); s*ee also McCoy*, 981 F.3d at 285.

Moreover, this Court recently reduced Stover's 324-month sentence to time served under 18 U.S.C. § 3582. *United States v. Stover Stockton*, ELH-99-352, ECF 657 (D. Md. Sept. 16, 2020).[11] Stover was convicted of being a part of the same conspiracy as Stockton. But, unlike this defendant, Stover was also charged with conspiring to murder a federal officer and a federal judge; Stockton was not charged with those offenses.[12]

---

[10] The sentencing has not yet taken place. And, of course, the judge is not bound by the terms of the C plea. But, it is a good indicator of the government's perspective.

[11] As noted, in 2016 Stover's sentence of 390 months was reduced to 324 months under Amendment 782.

[12] The jury did not reach a verdict on the conspiracy to murder counts for Stover.

The government argues that the ten-year disparity in sentences between the two brothers was based on Stockton's conviction for the shooting of Clinton Williams. ECF 670 at 7 n.6. But, according to defense counsel, Stockton was less culpable than his brother. ECF 665 at 1, 25. Indeed, in contrast to Stockton, Stover's PSR (ECF 656) reflects that he was the organizer or leader of the drug conspiracy organization, involving more than 90 participants. *Id.* ¶ 19. And, the government viewed Stockton as the "lieutenant or deputy to his brother," Stover. ECF 670 at 4. Most telling, Judge Garbis, who presided over the trials of both Stover and Stockton, originally sentenced Stover to 390 months of imprisonment, but sentenced Stockton to 330 months. *Cf. United States v. William Payton*, PJM-06-341, ECF 109 (D. Md. Mar. 10, 2021) (finding that the disparity between defendant and co-conspirator's sentence was an extraordinary and compelling circumstance that justified a sentence reduction).

Further, Stockton's behavior for the past 21 years, while in BOP custody, is an important indicator of whether he remains a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(ii). Courts place significant weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *See Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)); *see also United States v. Scott*, CCB-95-202, 2020 WL 2467425, at *4 (D. Md. May 13, 2020); *cf. United States v. McDonald*, 986 F.3d 402 (4th Cir. 2021) (noting that on a motion to reduce sentence under the First Step Act, district court must consider defendant's post-sentencing conduct); *United States v. Randall*, __ F. App'x __, 2021 WL 796428, at *1 (4th Cir. Mar. 2, 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation); *United States v. Rudisill*, 834 F. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in

denying motion under the First Step Act without addressing defendant's post-sentencing conduct). Stockton has successfully completed drug education; obtained his GED; and completed multiple other education classes. ECF 665 at 19-20; *see* ECF 665-4 at 1, 3 (Progress Report). Further, in over two decades in custody, he has had only a single infraction. ECF 665-4 at 2. This record is not indicative of someone who currently presents a danger to society.

Defendant, who is now nearly 50 years of age, has already served more than 21 years (approximately 262 months) in prison, exclusive of good conduct credit, amounting to about 55% percent of his sentence.   Adjusting for good time credit, defendant has served over 25 years, or 64% of his 480-month sentence. ECF 665 at 5. And, if the Court were to consider the 330-month sentence Judge Garbis initially imposed in an attempt to mitigate the harshness of the pre-*Booker* mandatory guideline scheme, Stockton has served 93% of that sentence.

Moreover, Stockton's incarceration in the midst of a global pandemic has "increased the severity of the sentence beyond what was originally anticipated such that the purposes of sentencing are fully met even with the proposed reduction." *United States v. Green*, TDC-10-761, 2020 WL 2992855, at *4 (D. Md. June 4, 2020); *see also United States v. Park*, No. 16-cr-00473, 2020 WL 1970603, at *5 (S.D.N.Y. Apr. 24, 2020) (noting that a sentence "that was sufficient but no greater than necessary" may now, in light of COVID-19, become "one immeasurably greater than necessary").

Considering Stockton's two decades of incarceration during which he has meaningfully matured and the changes in the sentencing landscape since 2004, Stockton's incarceration for a period of more than 21 years is sufficient to serve the sentencing goals of incapacitation, deterrence, retribution, and rehabilitation. Accordingly, I find that the factors under 18 U.S.C. § 3553(a) weigh in favor of reducing Stockton's sentence to time served plus fourteen days,

pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), with the added requirement of one year of home confinement as a condition of supervised release.

### V.   Conclusion

For the forgoing reasons, I shall grant the Motion (ECF 665).

An Order follows, consistent with this Memorandum Opinion.


Date: March 17, 2021                                         _____/s/_____
                                                                        Ellen Lipton Hollander
                                                                        United States District Judge